Filed 10/8/21  In re G.F. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re G.F., a Person Coming Under the Juvenile Court Law. | |
| | D078517 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3961B) |
| v. | |
| L.F. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Reversed with instructions.

Christy C. Peterson, under appointment by the Court of Appeal for Defendant and Appellant M.H.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant L.F.

Caitlin E. Rae, Chief Deputy County Counsel and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

1

## INTRODUCTION

M.H. (Father) appeals from the juvenile court's order denying his petition under Welfare and Institutions Code[1] section 388 to modify placement of his four-year-old child, G.F., from relative caregivers to him. Father contends he made a prima facie showing entitling him to a full hearing on the section 388 petition and the court abused its discretion by summarily denying it.

Father also appeals from the juvenile court's order terminating his parental rights. Father contends this order must be reversed in light of the California Supreme Court's subsequent decision in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), which disapproves of certain factors relied on by the juvenile court to find the parental-benefit exception to adoption did not apply. L.F. (Mother) joins Father's arguments and further contends that if his rights are reinstated, hers should be reinstated as well.

We agree with both of Father's contentions and, accordingly, we reverse. On remand, the juvenile court shall first conduct an evidentiary hearing on Father's section 388 petition to modify G.F.'s placement. If his section 388 petition is denied—and we express no view on how the court should decide this issue—the court shall, consistent with *Caden C.* and our decision, reconsider whether the parental-benefit exception to adoption applies for either parent. In connection with one or both of these hearings, the court may consider the family's current circumstances and any developments in the dependency proceedings that may have arisen during the pendency of this appeal.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Proceedings Before Father's Section 388 Petition*

A.	*Detention, Jurisdiction and Disposition*

In May 2018, Father, Mother, and G.F., who was then 16 months old, were living in a motel.  Father and Mother were both on summary probation with Fourth Amendment waivers.  On May 4, deputies from the San Diego County Sheriff's Department searched the parents' motel room and found 50 empty " 'dope baggies.' "  The deputies told Mother they would be back to conduct another search the following week.  On May 10, deputies found 0.80 grams of methamphetamine, about 73 grams of marijuana, and methamphetamine pipes in the room.  The deputies also found "small baggies with methamphetamine residue" and "marijuana 'shake' residue" on a nightstand that was within G.F.'s reach.  The child was wearing a dirty dress, had dirty feet and was "picking up various items [in the room] and placing them in her mouth."

Both parents denied knowledge or possession of the drugs and paraphernalia in the room.  Father, who was "agitated in his movements" and "smacking his lips indicating potential dry mouth," claimed he had been off methamphetamine " 'for like 6 months.' '  Father and Mother were arrested on charges of child cruelty and possession of a controlled substance.  Mother was also arrested on two active misdemeanor warrants.  Social workers, who responded from the San Diego County Health and Human Services Agency (Agency), took G.F. into protective custody and transported her to Polinsky Children's Center (Polinsky).

On May 11, 2018, the Agency filed a petition on behalf of G.F. under section 300, subdivision (b)(1) alleging the child was at substantial risk of

3

suffering serious physical harm or illness. In addition to keeping the child in an unsuitable home with drugs within her reach, the Agency alleged the parents had a lengthy history of abusing methamphetamine and, in a prior dependency proceeding, they had failed to reunify with G.F.'s older sibling, T.F., who had tested positive at birth for methamphetamine and was ultimately placed with the maternal grandparents under a permanent plan of legal guardianship.[2] The Agency also alleged under section 300, subdivision (g) that the parents were incarcerated and unable to arrange adequate care for G.F.

At the detention hearing on May 14, 2018, the juvenile court found the Agency had made a prima facie showing on the dependency petition, ordered G.F. detained at Polinsky or in a licensed foster home, and ordered supervised visitation for parents to be "reasonable" while they remained incarcerated and "liberal" when released.

At the contested jurisdiction and disposition hearing on July 19, 2018, the juvenile court took judicial notice of the parents' prior dependency case with T.F. and admitted into evidence the Agency's detention report, jurisdiction and disposition report, and several addendum reports. The

---

[2]     T.F.'s dependency case was initiated in September 2015 and also involved a March 2015 incident in which Mother sought medical attention after Father kicked her in the stomach when she was 12 weeks pregnant. Father reported he was not aware of the incident and claimed he " 'must have blacked out.' " The Agency had "little to no contact" with the parents during the case and, in April 2016, reunification services were terminated. In August 2016, T.F. was permanently placed under legal guardianship of maternal grandparents. In addition to T.F. (age 3), maternal grandparents also have legal guardianship of Mother's two other children (ages 8 and 6), while a fourth child of Mother's (age 4) was living with his father in a different state.

4

Agency initially recommended the court deny reunification services to both parents, based on their failure to reunify with T.F. and their untreated "chronic and pervasive [drug] addiction."[3] It later recommended only Father be offered reunification services because he, unlike Mother, had enrolled in a substance abuse treatment program. Father was attending his treatment program three times a week and, according to his counselor, he had not missed a day and was " 'one of the stars.' " Father was in compliance with "Phase 1" of the Dependency Drug Court Program (drug court) and attending parenting classes. He tested negative for drugs through the treatment program and with the Agency. The Agency "praised" Father on his progress, noting that he recognized his failure from T.F.'s dependency case and was "trying to do everything" to get G.F. back because he "loves his daughter." The Agency, however, warned Father that if he continued in a relationship with Mother and she "does nothing," he would be "still placing [G.F.] at risk."

The juvenile court followed the Agency's recommendations for the most part. It sustained the petition, finding the allegation under section 300, subdivision (b)(1) true by clear and convincing evidence. It dismissed the allegation under section 300, subdivision (g) since both parents had been released from custody in June 2018. The court removed G.F. from the parents' custody and placed her in the care of the Agency for suitable

---

3    Section 361.5, subdivision (b)(10) provides that reunification services need not be provided if a court ordered termination of reunification services for any siblings or half siblings of a removed child and the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling." Section 361.5, subdivision (b)(13) provides that no reunification services need be provided if a parent has a "history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period."

5

placement. The court found that Father was "actively involved" in his case plan and, despite the Agency's recommendation to deny Mother reunification services, the court ordered reunification services for both parents. The court stated that it felt "compelled" to do so because Father "indicated that they may want to be together as a family" and it would be in the child's best interest to offer services to Mother as well. The court commented that: "The mother's just a super-lucky person today because the dad decided to do something. I don't really think she's going to do anything, but there's really no harm/no foul in offering her the services."

B.    *Six-Month Review*

At the six-month review hearing on January 17, 2019, the Agency recommended that Father and Mother receive an additional six months of reunification services. G.F. had been placed with relatives, paternal aunt and paternal uncle by marriage, in November 2018 (hereafter relative caregivers). She was doing "very well," attending daycare full time, and her relative caregivers were willing to provide her "permanency."

Father continued to make progress in his case plan services. He was now in "Phase II" of drug court and had maintained his sobriety since May 3, 2018. He continued to attend his outpatient substance abuse treatment program and NA/AA meetings and continued working with his sponsor. Father reported he was working on enrolling in domestic violence offender group therapy. He visited G.F. consistently and visits were "good," such that he progressed to unsupervised visits on January 2, 2019.

Mother had enrolled in an outpatient substance abuse treatment program on July 12, 2018. She was attending weekly NA/AA meetings and had a sponsor. She reported that she had been clean and sober since May 3, 2018. Mother had also completed sessions of domestic violence victim group

6

therapy. She visited the child consistently, the visits were "positive," and she progressed to unsupervised visits on January 2, 2019.

The parents were each visiting G.F. twice a week, separate and unsupervised at the Family Visitation Center, which reported "the parents [were] appropriate, . . . play[ed] with the child, change[d] diapers, and show[ed] affection." The Agency reported there had been some concerns that the parents allowed their visits to overlap when they were to remain separate. The Agency felt the parents were "doing well" but had concerns about their ability to "effectuate and sustain . . . long-term change" for G.F.'s stability and safety. It noted T.F.'s dependency case was "just over 2 years ago and here [they] were . . . again for the same issues."

The juvenile court adopted the Agency's recommendations and continued the parents' reunification services for another six months. The court congratulated the parents on a "good job," adding: "Based on the parents' progress, it appears the child will be returned home. A permanent plan will not have to be selected."

C.    *12-Month Review*

At the 12-month review hearing on July 9, 2019, Father had graduated from drug court, continued attending NA/AA meetings, and had maintained his sobriety. He was participating in domestic violence offender group therapy and was employed and looking for housing. Mother had graduated from her outpatient substance abuse treatment program, had maintained her sobriety, was residing in a sober living facility and attending weekly NA/AA meetings. Both parents were in compliance with the terms of their formal probation and had no new criminal history since the May 10, 2018 incident that led to the dependency proceeding.

7

Both parents continued to have separate, unsupervised visits with G.F. The Agency tried to increase Father's visits but it proved "challenging due to his busy work schedule" and Mother was on track to begin overnight visits in mid-July. The parents had also resumed their relationship with each other, started having family visits with G.F. through the Incredible Families Program, and the Agency reported "there have been no safety concerns."

The Agency recommended reunification services be extended an additional six months for both parents and that they progress to overnight visits and then a 60-day trial visit. Noting this was a "high-risk case" because the parents had "lost multiple prior children to the Agency," it indicated wanting to "move slow[ly] and mak[ing] sure that the parents make[ ] the necessary behavioral changes over a long period of time."

The juvenile court adopted the Agency's recommendations and continued the parents' reunification services for another six months. The court acknowledged the parents had "both made substantive progress" with their case plans. The court found they had "regularly visited the child, made significant progress in resolving the problems that led to the removal, demonstrated the capacity to complete the objectives of the treatment plan and provide for the child's safety" and stated that "[t]here's a substantial probability the child could be returned to one of the parents by the 18-month date." The court also granted the relative caregivers' request for de facto parent status.

D.      *18-Month Review*

Since the last reporting period, Father had maintained his progress, including his sobriety, and continued working full time. Additionally, he completed his outpatient substance abuse treatment program and nearly half of his domestic violence offender group therapy program. Mother had also

8

maintained her progress, including her sobriety, and she had also completed her Incredible Families Program and domestic violence classes. However, she was asked to leave her sober living facility in August 2019 due to "accusations" that she was under the influence of PCP and "other drugs."[4] She began living with Father at a motel and reported to the Agency that she had been "really down" and "her anxiety was high" since moving to the motel and not having G.F. She agreed to suspend overnight visits with G.F. until the Agency received results from a hair follicle drug test, demonstrating to the Agency that she "was able to put her child's safety over her own needs." The test returned negative in September 2019.

On October 28, 2019, the Agency, with agreement by G.F.'s counsel, transitioned G.F. to have two overnight visits each week with both parents at the motel. The Agency planned to increase the duration of these overnight visits and to place G.F. with the parents. In November 2019, the Agency requested a 60-day continuance of the 18-month review hearing in order to plan a transition of G.F. to the parents for a 60-day trial visit.

On December 24, 2019, the parents began their 60-day trial visit with G.F. The Agency reported the child had "adjusted well to living with the parents" and the parents were "meeting" all of G.F.'s medical appointments. Father reported to the Agency that one month ago he had "drank a beer" with a co-worker. Father told the Agency he knew it was "wrong," he immediately told Mother, and neither Mother nor G.F. was present when he "relapsed." The social worker informed Father's probation officer of the incident. Mother told the Agency she was "not pleased" with Father's relapse on alcohol and

---

[4]     Mother and Father tested for drugs throughout the two-year span of the dependency proceedings with only negative results.

9

they were no longer together, although they continued to live together in the motel and co-parent. The Agency reported that Mother was "doing well" and "has worked hard on her services and her sobriety." Both parents tested negative for drugs with the Agency on November 14, 2019, and Father agreed to test again on January 14, 2020.

At the 18-month review hearing on January 16, 2020, the Agency recommended that G.F. be placed with her parents and that parents receive family maintenance services for six months. Father's counsel informed the juvenile court that he was "taking the relapse extremely seriously even though it was not his original drug of choice or the concern that brought this case in." Father submitted NA sign-in sheets indicating that he was attending once or twice a day. The court adopted the Agency's recommendations and placed G.F. in the parents' care. The court found that a "[p]ermanent plan of return home is appropriate, [and is] identified as a preferred plan" with a "[l]ikely date to finalize . . . in six months."

E. *G.F.'s Section 388 Petition to Change Placement from Parents to Relative Caregivers*

1. *The precipitating events.*

In a status review report filed July 2, 2020, the Agency reported the family moved into an apartment with Mother's cousin in May. Father continued working full time, earning enough money to cover family expenses, while Mother stayed at home to care for G.F. Mother had also participated in the "welfare to work program," but "since the COVID-19 pandemic, everything slowed down" and she stopped attending. Both parents continued to test clean for drugs with the Agency. Father's probation officer also reported that he had been testing negative through probation. The Agency found that G.F. had "done well," was in "good health," and appeared "very happy" in her parents' care.

10

The Agency had concerns, however, that "since the COVID-19 health pandemic, [Mother] did minimal work on her services." Although Mother continued to test clean, the Agency noted she was unable to find a sponsor and was not "working her steps." Mother reported attending virtual NA meetings but did not provide the Agency with verification. She told the Agency she was consistently attending therapy, but the Agency learned from her therapist that she was discharged in April 2020. Because Mother had a history of depression and anxiety, the Agency was worried that "with the [COVID-19] stay at home orders and the isolation it brings," Mother was not addressing her mental health needs. Mother told the Agency she did not think she needed therapy because she had stable housing and was no longer under the stress of financial difficulties. It was the Agency's opinion that Mother "follows a behavioral pattern in which she is in and out of services. . . . [She] consistently attends her services when she wants the case to move forward but stops attending once she feels that she has stable placement."

For the next review hearing, the Agency initially recommended the parents receive an additional six months of family maintenance services and that G.F. remain in the parents' care. But on July 14, 2020 the Agency filed an addendum report noticing its intent to file a supplemental dependency petition under section 387 to remove G.F. from both parents. That same day, G.F.'s counsel filed a section 388 petition to modify G.F.'s placement and return her to the relative caregivers. This turn of events was precipitated by a July 11, 2020 incident, in which Father relapsed on alcohol, Mother's new boyfriend punched Father, and nobody reported the incident to the Agency or authorities (hereafter the July 11 incident). The Agency learned of the incident from a referral to the child abuse hotline on July 11. That night,

11

police officers conducted a welfare check at the home and found "everything checked out ok." The Agency began its investigation of the referral the next day.

Mother reported that Father had relapsed on alcohol and had been drinking for the past month. He had been staying at motels but came home "intoxicated" on July 11. He had "two Budweiser beers" by the time he came over at about 9:00 a.m. and went out again later to buy more beer. Father kept taking G.F. to his room because he wanted to spend time with her. At some point, Father became "argumentative" with Mother and she suggested he go to sleep. He got on the phone and she heard him say, " 'you fuckin bitch.' " Mother then took G.F. and her cousin's child outside the apartment. Father tried to take G.F. for a walk around the apartment complex while he was drinking a beer. Mother discouraged Father from doing so and he took G.F. just "outside the door." Father was "coming in and out yelling profanities." Mother's new boyfriend then punched Father in the face because he had called Mother a "profane name." G.F. looked "scared" so Mother took her to the park around 3:30 p.m. Mother denied she had been drinking alcohol or that G.F. witnessed the boyfriend punch Father.

A neighbor told the Agency she saw Father intoxicated but "she did not see anything that made her feel the mother was drinking." The neighbor reported seeing Father argue with Mother and "yelling at her"; the neighbor took G.F. away from the apartment door so the child did not see the argument. Mother's cousin reported Father came home, he had already been drinking, and he "continued to drink throughout the day and became very intoxicated," but Mother was not drinking. The cousin later reported that it was the first time she saw Father act "belligerent when he drinks," and he " 'was threatening about busting windows and popping tires.' " Mother's

boyfriend of one and a half months told the Agency he met Father for the first time on July 11 and admitted he punched Father in the face because Father " 'disrespected [Mother] in a way he shouldn't have.' " The boyfriend said nothing further happened, they did not continue to fight, and Father left and did not return home that night.

Father initially lied to the Agency about relapsing on alcohol, but later admitted he "drank two beers." He confirmed Mother's boyfriend punched him in the face but denied he "physically responded." Although he also initially denied Mother had relapsed, he told the Agency Mother was drinking alcohol in the home around G.F. About a week after the incident, Father reported to the Agency that he returned to his substance abuse treatment program, was in counseling, and attending daily NA meetings.

Both parents agreed on July 11 to a safety plan to allow G.F. to temporarily return to the relative caregivers until July 14, pending the Agency's assessment of G.F.'s safety. The Agency expressed concerns that "both parents were drinking and no one was protective or called law enforcement" and although the parents "have received two years of services, various [Child Family Team meetings] and intervention," "no one used the tools they have learned in their services." In particular, the Agency was troubled that neither parent informed the Agency about Father's relapse on alcohol or the July 11 incident, which incident the Agency found "very similar to the original protective issues."

On July 14, 2020, the juvenile court found a prima facie showing of changed circumstances on G.F.'s section 388 petition and set the matter for an evidentiary hearing. Both counsel for Mother and Father expressed concerns with the manner in which the Agency removed G.F. from Mother's care, when the Agency had determined through independent witnesses that

13

Mother—who had "tested clean throughout the life span of [the] case"—had not relapsed on alcohol or drugs. Counsel for Father also informed the court that he "deeply regret[ted]" his relapse and he had re-enrolled into the substance abuse treatment program. Both parents requested the court to permit G.F. to stay in Mother's care. The court instead ordered G.F. to be detained with the relative caregivers and granted liberal and supervised visitation for the parents.

In an addendum report filed July 17, 2020, the Agency recommended that the court terminate the parents' reunifications services and set a section 366.26 hearing to select a permanent plan of adoption for G.F. By this time, the relative caregivers expressed that they wanted to adopt G.F. if reunification failed. The Agency noted that both parents had exhausted their reunification time, "have lost children in the past for domestic violence and substance abuse," and that "this is a pattern of behavior for the parents . . . [who] cannot put [G.F.'s] needs ahead of their own."

2. *The contested section 388 hearing.*

At the contested hearing on G.F.'s section 388 petition, on August 11, 2020, the court heard testimony from two of the Agency's social workers and Mother. It also admitted into evidence the Agency's reports.

The first social worker to testify had conducted the initial investigation of the referral regarding the July 11 incident. She testified to her findings and since we have already summarized those findings, *ante*, we do not repeat them here. The social worker testified that her safety concern with Father was that he was drinking in the home around the child and with Mother, it was her failure to protect the child. The social worker testified she "would have been less concerned about [G.F.'s] safety had the mother notified the agency immediately when the father relapsed." She also "felt" Mother should

14

not have allowed Father into the home around G.F. after he relapsed on alcohol, nor allow him to leave the residence with the child while intoxicated. The social worker testified she had no reason to believe Mother was consuming alcohol on July 11.

The second social worker continued the Agency's investigation of the July 11 referral. We have also previously summarized her findings, *ante*, and do not repeat them here. This social worker testified: "[W]hat makes the [A]gency worry is [Mother's] decision-making. She allowed alcohol in the home when she is still in recovery. She has a lack of insight this whole time. She is saying it is the [F]ather's fault, and that she has done nothing wrong. She sees nothing wrong with the events that lead up to the arguing. She received over two years of services and didn't learn anything to prevent the incident from happening, but not only that, this is a case that [Mother] lost the child in the past for substance abuse and domestic violence. [¶] . . . [T]his is just showing a pattern of behavior with [Mother]. The risk factor is in the fact [that] she has been in and out of services throughout the whole case, and that makes the Agency worry about her and whether she can protect [G.F.]." The social worker testified that "the [A]gency would have been more open to working with [Mother] had she seen the wrongdoing in the case."

Under cross-examination, the social worker agreed that from May 2018 to "when the pandemic hit," Mother was "actively involved in all of her services" and that she went from being "homeless" to now living in an apartment. She acknowledged that Mother has never tested positive for drugs or alcohol during the two-year span of the case—indeed Mother again tested negative on July 21, 2020, has completed her domestic violence services, and has never been "re-referred" to any services for substance abuse or domestic violence. She agreed that Mother no longer demonstrated a

15

pattern of substance abuse. She also acknowledged there have been no incidents of domestic violence, other than the July 11 incident, and that Mother reported Father's first relapse on alcohol in January 2020. The social worker maintained, however, that the July 11 incident "is very similar to the original protective issue."

Mother testified Father "came with a beer when he showed up" at the home at approximately 9:30 a.m. on July 11. Father was there most of the day without any incident, but he continued to drink and became more intoxicated "throughout" the day. At approximately 2:00 p.m., Father started to argue with Mother about "the fact that he didn't want to go to bed." Mother had a guest over for a play date and the children, including G.F., were outside throughout the day. An hour later, Father became "argumentative" and started "yelling" and "screaming" at Mother and calling her a " 'bitch.' " "That is when [Father] got assaulted by [her] boyfriend." Mother, in response, took the children—including G.F.—to the park because she "didn't want to have anything to do with [Father] being there." Mother testified that Father had been living in motels for a "few weeks," and he still had contact with G.F. but she never left the child unattended with him. She did not tell the Agency about Father's relapse or the July 11 incident "because [they] were so close to closing" the case.

Father did not testify but submitted evidence that he admitted himself into a substance abuse treatment program on July 20, 2020 and was participating in all treatment plan goals.

After considering arguments of counsel, the juvenile court found by clear and convincing evidence a change of circumstances and granted G.F.'s section 388 petition. The court noted the "case is two years old" and "[t]here was a prior case that did not end well." It found Mother had completed "all of

16

her services," including domestic violence services and therapy, and "stayed sober." Thus, the court found that she "should have all of the tools to be protective," but she failed to use them on July 11 to protect G.F. Instead, Mother demonstrated "bad decision-making, which put a three-year-old child at a huge amount of risk." The court also found that Mother did not tell the Agency about the July 11 incident or Father's relapse on alcohol because she "was running out the clock . . . to get [the Agency] out of [her] life."

Although the juvenile court found the parents had made "some progress" with the provisions of their case plans, it terminated their reunification services because the family was past the 18-month date and reasonable services had been provided. The court set a section 366.26 hearing to select a permanent plan for G.F. and ordered the child to remain with the relative caregivers.

## II.

### *Father's Section 388 Petition*

On December 8, 2020, Father filed a section 388 petition to modify the juvenile court's August 11 removal order, asking that G.F. be placed with him. Father cited as changed circumstances that he had since completed outpatient substance abuse treatment, had regularly and consistently visited with G.F., and had remained "clean and sober" since the July 11 incident. He asserted that placing G.F. in his care would be in her best interest because they "have a strong bond with one another," he had "demonstrated sobriety and protective capacity, and he loves the [child] very much and is willing and able to safely provide for her needs." In support of his section 388 petition, Father attached proof that he had tested negative for drugs, including methamphetamine, each week from July 20 through November 2, 2020.

On January 5, 2021, Father amended his section 388 petition to provide the court with a client progress report from his substance abuse treatment provider, proof of additional negative drug tests through December 31, 2020, and a log of his visits with G.F. The progress report noted that Father was participating in all treatment plan goals, had successfully completed a 90-day outpatient program, was continuing in after-care recovery services at his own request, attending self-help meetings and "going above needed requirements," and engaged with his sponsor. The progress report also confirmed that Father had tested negative for drugs 15 times since July 20, 2020.[5]

In support of his petition, Father also relied on the Agency's section 366.26 report, filed on December 2, 2020, for the Agency's observations of Father's relationship with G.F. In that report, the Agency noted that both parents consistently visited G.F. It believed there was not a significant parent-child relationship between Mother and G.F. and, although the child recognizes Mother as her mother, the Agency believed the child does not see Mother as a parental figure. However, the Agency observed that there is a parent-child relationship between Father and G.F. and that the child refers to him as, "[m]y dad." During his visits, Father had "age appropriate conversations" with the child and often told her to "be careful or not do something, and [the child] would listen." Father told the child to "be careful

---

[5] On January 11, 2020, Mother filed her own section 388 petition requesting that G.F. be returned to her care. She stated that she had remained sober, was working with her therapist "to further address" domestic violence, had consistently visited G.F. and maintained a parental bond with the child. She also stated that she no longer lives with Father. Since Mother has not appealed the juvenile court's order denying her section 388 petition, we do not discuss it further.

when doing certain things," including, for example, going down a slide, jumping up and down from benches, or running around the playground. Nonetheless it was the Agency's opinion that the child sees the relative caregivers, not Father, as the "parental figure[s]."

The Agency opposed Father's section 388 petition. The Agency acknowledged that Father had tested negative for drugs from July to December 2020, had completed an outpatient substance abuse treatment program, was currently participating in after-care services, and participating in all treatment-plan goals. It commended Father for "making progress" and "remaining clean" since the July 11 incident, but believed his "circumstances have not completely changed." It noted that Father "has participated in services before, has made significant progress and maintained sobriety, has created a relapse prevention plan before and has been able to care for his daughter when she was placed with him and the mother." But, according to the Agency, "[t]his is not the first time the father has been able to demonstrate that his circumstances can change" and he "[u]nfortunately" relapsed on alcohol again, causing G.F. to be removed from his care a second time. The Agency also noted that, although Father was actively looking for an apartment, he did not have stable housing and was residing in a motel.

The Agency acknowledged that Father and G.F. "have a good relationship," and that the child is "aware of when and what days she visits with her father" and "enjoys her time with him." It was the Agency's opinion, however, that "this does not signify [G.F.] sees her father as [a] parental figure." Despite its recommendation to deny Father's section 388 petition, the Agency stated that it "does not intend to discard the relationship" between Father and G.F. Rather, the Agency suggested their relationship could continue even if parental rights were terminated because the relative

19

caregivers acknowledge the importance of the visits between both parents and G.F., and the relative caregivers are "open to continuing contact."

At the hearing on January 12, 2021, Father's attorney criticized the Agency's reasoning in opposing the section 388 petition: "The Agency's position is that the father's efforts essentially don't mean anything because he has done services before and that he had a relapse. . . . [That] logic is completely circular. There's no possibility, with that logic, that any 388 could ever be granted at this stage if the parent was already given a chance to succeed and were not successful, then they can never be successful in the future." Counsel further argued the Agency's focus was not the legal standard the court was required to apply in order to grant Father a full hearing. Counsel then argued that Father has "certainly shown, at minimum, a prima facie change in circumstances" since the last order—based on his completion of an outpatient substance abuse treatment program, his work with a sponsor, and his demonstration of a "sustained commitment to sobriety" and to his daughter by maintaining regular and consistent visitation, "that by all accounts appears to be extremely positive for the child," such that there can be benefit to her if she is returned to Father's care.

G.F.'s counsel agreed that Father had made a prima facie showing on his petition to warrant a hearing. However, G.F.'s counsel did not believe Father could ultimately meet his burden of proof to have the petition granted because a change of placement would not be in the child's best interest. But G.F.'s counsel agreed, "we will need an evidentiary hearing to get to those arguments."

The Agency's counsel requested the court summarily deny Father's section 388 petition. It argued that "both parents have done services before that resulted in relapse and removal, and not just for this child but for a

previous child, and this is the second removal for this child." Counsel argued that "there are changing circumstances" but "not changed circumstances." She further argued "the crux" of the issue is the "best interest prong, and it's not in this child's best interest to hold up permanence any longer" because "[t]he parents have had over two years of services and failed to remain clean and sober." Counsel for the relative caregivers "echo[ed]" the Agency's argument.

The juvenile court considered "the entire file," including the Agency's addendum reports, and summarily denied Father's section 388 petition. It found that "there's been a change in circumstances, but it appears more changing circumstances in light of the history of the case." The court found there was "*no evidence at all* to indicate that it would be in the best interest of [G.F.] to return to either parent at this time." (Italics added.) It considered the prior dependency with the parents' other child, T.F., and that the current case went to an 18-month review and G.F. is about to turn four years old. The court stated that Father's argument that he is bonded with the child is "an argument for the [366].26 hearing." The court stated: "It would be a total gamble to return this child to either parent because they've proved that they can stay sober and then they don't, and this is after a significant period of sobriety. Not only that, . . . [t]here's violence involved in the situation also," presumably referring to the July 11 incident.

### III.

*Contested 366.26 Hearing*

At the contested section 366.26 hearing on January 29, 2021, the juvenile court admitted into evidence the Agency's various reports, including the section 366.26 report, and the attachments to Father's section 388 petition, as amended. Due to the ongoing COVID-19 pandemic, the hearing

was conducted remotely by Microsoft Teams. Only Father and Father's aunt, A.O., testified. Mother did not appear despite several attempts by the court clerk to reach her; instead, she appeared through counsel.

Father testified he had not consumed alcohol since July 11, 2020, and had not used "drugs" since May 3, 2018. As confirmed by the attachments to his section 388 petition, Father tested negative for drugs from July 2020 through December 2020.

When G.F. was placed with Father from December 2019 to July 2020, he shared parenting responsibilities equally with Mother. He worked a nightshift and would care for G.F. when he came home until Mother awakened. During that time, he would keep G.F. busy with activities and then make her breakfast. When Mother woke up, he would take a nap before his next shift. Sometimes, G.F. would come into the room and spend time with him while he tried to sleep. Father provided the family with food and clothes, stating "[t]hat's where all [his] check would go."

Since her removal from his care in July 2020, Father has been visiting with G.F. twice each week, supervised. He has never missed a visit except for one when the child was sick. He has also called the child three times a day, including a daily FaceTime contact. Father testified G.F. calls him "daddy" or "dad," the child is "really excited" when they start their visits and tells him, "Daddy, I love you and missed you." And she is sad at the end of their visits. Father told the court the July 11 incident had been a "mistake" and he was "fixing this mistake by doing everything and anything that [he] can do" to get G.F. back. The Agency, G.F.'s counsel, and counsel for the relative caregivers did not ask any questions of Father.

A.O. testified she lived in the same household with G.F. and supervised Father's weekly visits with the child. A log prepared by A.O. was admitted

into evidence and it showed she supervised Father's visits from July 26 to November 29, 2020. A.O. testified that Father and G.F. have a "very close relationship." He calls G.F. at least twice each day, including "video chat[s]." The child calls Father, "daddy," and asks when she gets to see Father on days they don't visit. A.O. also supervised Mother's visits with G.F., noting the child refers to her as "mommy."

Father's counsel requested that the juvenile court find the parental-benefit exception to adoption applied, not terminate parental rights, and order a less permanent plan of legal guardianship with relative caregivers. Among other points, Father's counsel argued Father did not relapse on drugs, the protective issue that brought G.F. into dependency, and he "immediately" sought treatment for the July relapse on alcohol.

The Agency conceded the parents have regularly and consistently visited with G.F. and "there might be some benefit from continuing the parental relationship," but argued the benefits of adoption "far outweigh" any benefit the child would receive from continuing a relationship with her parents. It argued "the parents have been unable to demonstrate long-term sobriety," the child had been a dependent "almost half her life," she looks to her relative caregivers for "comfort" and "deserves the permanence of adoption." The Agency argued the parental-benefit exception did not apply and the court should terminate parental rights. G.F.'s counsel agreed with the Agency there was no parent-child bond that would outweigh adoption and G.F. would "not be greatly harmed" by the termination of parental rights. G.F.'s counsel further argued G.F. "shows a deep attachment to her current caregivers who have served as a safety net for [her] throughout her entire life" and she looks to her caregivers to meet her daily needs.

The juvenile court "adopt[ed] the arguments" made by the Agency and G.F.'s counsel, finding by clear and convincing evidence that G.F. was generally and specifically adoptable and the parental-child benefit exception to adoption did not apply. Accordingly, the court terminated parental rights and selected adoption as the appropriate permanent plan.

In so ruling, the court noted G.F. had spent about "half of her life" with the relative caregivers, while the parents have had supervised visits for the last eight months. The court acknowledged that "dad doesn't get to show that he can be a good parent" within the confines of his limited and supervised visitations, but stated that was "the fault of the parent." It continued that "Dad relapsed and got involved in a scuffle with mom's new boyfriend/husband" and "[t]hat's why he's only had supervised visits" and "why he's unable to maintain that relationship and to act as a parent." The court explained: "Clearly, when I weigh this out, the permanent plan of adoption is the appropriate permanent plan. It outweighs the relationship that this child has with the parents, which I'll describe as frequent and loving, and there's an emotionally significant relationship. They're warm and affectionate. But the hard lifting has been done by the relative caregivers for [a] majority of this time. The parents just have a history of not being able to stay sober and doing what they're supposed to do in order to . . . maintain custody of this child and to maintain a positive parental relationship."

## DISCUSSION

### I.

*The Juvenile Court Erred in Summarily Denying*
*Father's Section 388 Petition*

A.   *Legal Principles*

"Once reunification services are ordered terminated, the [juvenile court's] focus shifts to the needs of the child for permanency and stability,"

24

and the burden "is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 304 (*Marilyn H.*).) Thus, in this context, "[s]ection 388 provides the 'escape mechanism' . . . [that allows] the court to consider new information" before choosing a permanent plan for the child. (*Ibid.*)

Section 388 provides, in pertinent part: "Any parent . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1).) The juvenile court must hold a hearing on the petition "[i]f it appears that the best interests of the child . . . may be promoted by the proposed change of order." (*Id.,* subd. (d).)

Although the juvenile court has discretion in determining whether the allegations in a section 388 petition are sufficient to warrant an evidentiary hearing, "there are safeguards to prevent arbitrariness in precluding such hearings. Specifically, a petition must be liberally construed in favor of its sufficiency [citation] and a hearing may be denied only if the application fails to reveal any change of circumstance or new evidence which might require a change of order. Only in this limited context may the court deny the petition ex parte." (*In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413–1414, fn. omitted (*Jeremy W.*); see also Cal. Rules of Court,[6] rule 5.570(a) [petition "must be liberally construed in favor of its sufficiency"] and rule 5.570(d) [petition may be denied without a hearing only where the petition "fails to state a change of circumstance or new evidence that might require a change

---

[6] All further references to "rules" are to the California Rules of Court.

of order or termination of jurisdiction or fails to show that the requested modification would promote the best interest of the child"].)

" 'Thus, if the petition presents *any evidence* that a hearing would promote the best interests of the child, the court will order the hearing.' " (*Jeremy W.*, *supra*, 3 Cal.App.4th at p. 1414, italics added.) " 'The parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing.' " (*In re Hashem H.* (1996) 45 Cal.App.4th 1791, 1799.) A parent does not need to show "a probability of prevailing" on his or her petition in order to obtain a full hearing on a section 388 petition. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432 (*Aljamie D.*); accord *Jeremy W.*, at p. 1414.)

B.    *Analysis*

Here, the juvenile court acknowledged Father had demonstrated at least changing circumstances, but summarily denied Father's section 388 petition after finding there was "*no evidence at all* to indicate that it would be in the best interest of [G.F.] to return to either parent." (Italics added.) We disagree and conclude, instead, that Father's section 388 petition made a prima facie showing sufficient to warrant an evidentiary hearing.

We acknowledge, as the juvenile court pointed out, that Father has a history with substance abuse, and that G.F. had been removed from his care a second time approximately six months before the hearing on his section 388 petition. However, the original protective issue in this case stemmed from Father's (and Mother's) use of methamphetamine. There is no real dispute that Father effectively addressed that issue. He graduated from drug court and remained sober from methamphetamine for over two years. Indeed, as we have noted Father did not fail a single drug test throughout the pendency of this case.

Early on, the Agency praised Father for "trying to do everything" he could to get G.F. back and acknowledged that he "loves his daughter." Father, along with Mother, progressed to overnight visits, a 60-day trial visit, and, eventually, the juvenile court returned G.F. to the parents' care. Although Father first admitted drinking alcohol prior to that placement, the court noted "it was not his original drug of choice or the concern that brought this case in," and found that a "[p]ermanent plan of return home is appropriate, [and is] identified as a preferred plan." Thereafter, Father continued working full time, allowing Mother to remain at home with G.F., and, in early July 2020, the Agency reported G.F. had "done well," was in "good health," and appeared "very happy" in her parents' care.

Unfortunately, Father began to struggle with alcohol. After the July 11 incident, Mother reported that Father had been drinking alcohol for the past month. She said Father had been staying at motels, away from G.F., but came home "intoxicated" on July 11. It appears from the record that incident was the first instance in which Father's use of alcohol impacted G.F. and, immediately thereafter, Father took steps to address the issue. Within a week, Father had returned to his substance abuse treatment program, was in counseling, and was attending NA meetings daily. As Father's section 388 petition alleged, he then completed an additional outpatient substance abuse treatment program and was able to remain "clean and sober" from alcohol as well.

Liberally construing, as we must, Father's section 388 petition (see *In re Daijah T.* (2000) 83 Cal.App.4th 666, 672; rule 5.570(a)), we conclude the allegations were sufficient to make the minimal prima facie showing required to proceed to a full hearing (see *Jeremy W.*, *supra*, 3 Cal.App.4th at p. 1414

[noting a full hearing on a section 388 petition is required if "any evidence" shows changing a court order would promote the best interests of a child]).

This is not a case in which Father made a last-ditch effort to engage in the reunification process on the eve of the section 366.26 hearing. (Cf. *In re Angel B.* (2002) 97 Cal.App.4th 454, 463–465 [court did not err in denying section 388 petition without an evidentiary hearing where mother "had very little contact with her child, had failed to follow the plan for reunification services," and had been sober for a "very brief" period].) Instead, Father remained "clean and sober" from methamphetamine for over two years, maintained an emotionally significant relationship with G.F. and continually worked towards reunification. As noted, shortly before the July 11 incident, the Agency found G.F. was in "good health" and "very happy" while in Father's care.

Further, as his petition stated, in the months following the July 11 incident, Father was doing all that he could and "going above needed requirements" to address the most recent protective issue—his use of alcohol. Although he had only remained sober from alcohol for six months, Father had demonstrated a commitment and ability to stay sober from methamphetamine over the previous two years, and had voluntarily re-engaged in substance abuse services to address his use of alcohol. Thus, Father's section 388 petition made "a strong prima facie showing" on "the single negative factor" now affecting his ability to safely parent G.F. (See *Jeremy W., supra,* 3 Cal.App.4th at p. 1416.)

The juvenile court suggested Father's use of alcohol after a lengthy period of sobriety from methamphetamine indicated he was unable to maintain sobriety indefinitely, but the reverse is also true. The fact that Father was able to overcome his addiction and stay sober from

28

methamphetamine—never once relapsing in well over two years—is evidence that he can do the same with alcohol. At a minimum, he should have been afforded the opportunity to present evidence, perhaps including testimony from his substance abuse counselor who was present and available to testify at the section 388 hearing, addressing his recent recovery from alcohol in the context of his previous struggles with and lengthy sobriety from methamphetamine. Notably, although it was G.F.'s counsel that filed the previous section 388 petition asking the juvenile court to remove G.F. from the parents' care, it was also G.F.'s counsel who *agreed* that Father had made a prima facie showing on his own section 388 petition such that an evidentiary hearing was warranted.

Finally, we note that the juvenile court found, in the context of the subsequent section 366.26 hearing, that there was an "emotionally significant relationship" between Father and G.F. The court incorrectly indicated that relationship was not relevant to the section 388 petition; to the contrary, evidence supporting the existence of an "emotionally significant relationship" also supported, at a minimum, Father's assertion that placing G.F. back in his care would be in her best interest because they "have a strong bond with one another," "and he loves the [child] very much and is willing and able to safely provide for her needs."[7] (See *In re J.M.* (2020) 50 Cal.App.5th 833, 848 [noting a court, in evaluating a child's best interest in a section 388 petition,

---

[7] We note that the juvenile court went on to conclude, again in the context of the section 366.26 hearing, that Father's relationship with G.F. did not outweigh the benefits of adoption. We address that ruling, *post,* but, in any event, any factual findings the court subsequently made in the context of the section 366.26 hearing are not sufficient to support its denial of an evidentiary hearing on the section 388 petition. (See *Aljamie D., supra,* 84 Cal.App.4th at p. 433.)

should consider among other factors " 'the strength of relative bonds between the dependent children to both parent and caretakers' "].)  To the extent the juvenile court concluded there was "no evidence at all" that Father could safely provide for G.F.'s needs because of his alcohol use, we disagree for the reasons already discussed.

Accordingly, we conclude Father's section 388 petition made *at least* a prima facie showing that modification of the court's previous order removing G.F. from parental care and terminating reunification services was in the best interest of G.F., sufficient to trigger the need for an evidentiary hearing. (See *Aljamie D.*, *supra*, 84 Cal.App.4th at p. 432; *Jeremy W.*, *supra*, 3 Cal.App.4th at p. 1414.)  We thus reverse the court order summarily denying Father's section 388 petition and remand the matter for the court to conduct a full hearing on his petition.  We acknowledge the unfortunate delay in permanency that can result from such a decision but, as we explain next, we would separately conclude that reversal of the order terminating parental rights is compelled by *Caden C.*  In that context, any further delay caused by the evidentiary hearing on Father's section 388 petition should be minimal.  We also reiterate that we express no view on how the juvenile court should decide Father's section 388 petition on remand.

II.

*The Juvenile Court Relied on Certain Factors that Caden C. Has Since Rejected in Finding the Parental-Benefit Exception to Adoption Did Not Apply*

Father's next contention is the juvenile court erred by not finding a parental-benefit exception to adoption and terminating his parental rights. Mother joins Father's arguments and further contends that, if his rights are reinstated, hers should be reinstated as well.  (See *In re DeJohn B.* (2000) 84 Cal.App.4th 100, 110.)

After the juvenile court terminated parental rights, clearing the way for G.F.'s adoption, our Supreme Court decided *Caden C.*, *supra*, 11 Cal.5th 614. In *Caden C.*, the Court reversed the "recent trend in the Courts of Appeal to place great emphasis on a parent's failure to make progress in addressing the problems that led to the child's dependency" and clarified the factors a juvenile court may and, as particularly relevant here, may *not* consider in deciding whether to terminate parental rights. (*Id.* at pp. 629, 632–639.) Without the guidance provided in *Caden C.*, the juvenile court in the instant case relied on several factors that the Supreme Court has now identified as improper in determining whether the parental-benefit exception to adoption applied. This was error and constituted an abuse of discretion. (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159 (*Charlisse C.*) [a "disposition that rests on an error of law constitutes an abuse of discretion"].)

A.    *Legal Principles*

When the juvenile court sets the section 366.26 hearing, it has determined the dependent child cannot safely return to a parent's custody and reunifications services have been terminated. (*Caden C.*, *supra*, 11 Cal.5th at p. 630; *Marilyn H.*, *supra*, 5 Cal.4th at p. 304; § 366.26, subd. (b)(1).) There is now an "assumption . . . that the problems that led to the court taking jurisdiction have not been resolved" and, thus, "the question before the court [at the section 366.26 hearing] is decidedly not whether the parent may resume custody of the child." (*Caden*, at p. 630.) Indeed, it is no longer permissible to order reunification at this juncture. (*Ibid.*, citing *In re Zeth S.* (2003) 31 Cal.4th 396, 411.) Instead, the focus of the dependency process changes from reunification services to the child's need for permanency and stability and the court is to select and implement a permanent plan for the child. (See *Marilyn H.*, at p. 304; *In re Celine R.*

31

(2003) 31 Cal.4th 45, 52–53 (*Celine R.*) [The section 366.26 hearing is "designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' "].)

At the section 366.26 hearing, the court has three options of a permanent placement: adoption, guardianship, or long-term foster care. (§ 366.26, subd. (b).) Of these options, "[a]doption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) While legal guardianship or long-term foster care leaves parental rights in place, adoption "requires terminating the natural parents' legal rights to the child." (*Id.* at p. 574.)

"Even when a court proceeds to select [adoption as] a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception. What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. [Citations.] The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra*, 11 Cal.5th at pp. 629–630, citing § 366.26, subd. (c)(1)(B)(i).)

Pursuant to section 366.26, the juvenile court must first determine by clear and convincing evidence whether the child is likely to be adopted and, if

32

it does, "then the court shall terminate parental rights to allow for adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 630, citing *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249–250 (*Cynthia D.*) and § 366.26, subd. (c)(1).) "But if the parent shows that termination would be detrimental to the child [due to the parental-benefit exception], the court should decline to terminate parental rights and select another permanent plan. (See § 366.26, subd. (c)(1)(B)(i)–(iv), (4)(A).)." (*Caden C.*, at pp. 630–631.) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Celine R.*, *supra*, 31 Cal.4th at p. 53.)

The first element of the parent's burden in establishing the parental-benefit exception—regular visitation and contact—is "straightforward" and "[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632; § 366.26, subd. (c)(1)(B)(i).)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632, citing § 366.26, subd. (c)(1)(B)(i).) "[T]he relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C.*, at p. 632, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) With the focus on the child, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, at p. 632.) Recognizing that "rarely do '[p]arent-child relationships' conform to an entirely consistent pattern," our Supreme Court has stated that "it is not necessary — even if it were possible — to calibrate a precise 'quantitative

33

measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' " (*Ibid.*)

"Concerning the third element — whether 'termination would be detrimental to the child due to' the relationship — the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633, citing § 366.26, subds. (c)(1)(B) and (c)(1)(D).) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship — in effect, *what life would be like for the child in an adoptive home without the parent in the child's life*." (*Caden C.*, at p. 633, italics added.) Thus, " '[i]f severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights." (*Ibid.*)

This third element—whether termination of parental rights would be detrimental to the child—is the most difficult question for the juvenile court to resolve. Where the court has found that regular contact and visitation have continued, and that this contact has created a relationship that benefits the child, the court must "decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 632, citing *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) As the Supreme Court stated, determining the "harm associated with severing the relationship is a subtle enterprise." (*Caden C.*, at p. 634.) A parent-child relationship sometimes

"involves tangled benefits and burdens" and "[i]n those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Ibid.*)

The Supreme Court in *Caden C.*, therefore, provided guidance on the factors a juvenile court may and, importantly in the instant case, may *not* consider in deciding whether termination of parental rights would be detrimental to a child. First, it is improper to compare a "parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)" when weighing whether termination would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Because "[n]othing that happens at the section 366.26 hearing allows the child to return to live with the parent," a court "should not look to whether the parent can provide a home for the child." (*Ibid.*) The hearing "is decidedly not a contest of who would be the better custodial caregiver." (*Ibid.*) Rather, "the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid.*) "Even where it may never make sense to permit the child to live with the parent, termination may be detrimental." (*Ibid.*)

Second, a parent's "continued struggles" with the issues that led to dependency cannot, "standing alone," be a bar to the parental-benefit exception as such a rule "would effectively write the exception out of the statute." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) Because reunification services have been terminated when the court sets the section 366.26 hearing, "it all but presupposes [when it holds the hearing] that the parent has not been successful in maintaining the reunification plan meant to address the problems leading to dependency." (*Caden C.,* at p. 637.) Noting that "[t]he parental-benefit exception can therefore only apply when the

parent has presumptively *not* made sufficient progress in addressing the problems that led to dependency," the Supreme Court "reject[ed] the paradoxical proposition . . . that the exception can only apply when the parent *has* made sufficient progress in addressing the problems that led to dependency." (*Ibid.*)  In demonstrating detriment, "[p]arents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception."  (*Id.* at p. 637, fn. 6 [disapproving a line of cases that held to the contrary].)

However, a parent's struggles with the issues that led to dependency "often prove relevant to the application of the [parental-benefit] exception" because it "may mean that interaction between parent and child at least sometimes has a " ' "negative" effect' on the child."  (*Caden C.*, *supra*, 11 Cal.5th at p. 637.)  But a parent's struggles "are relevant only to the extent they inform the specific questions before the court:  would the child benefit from continuing the relationship and be harmed, on balance, by losing it?  The parent's continuing difficulty with mental health or substance abuse may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent."  (*Id.* at p. 638.)  "Nor could a parent's struggles be relevant simply because they might conceivably affect the parent's ability to regain custody of the child," because return to the parent's custody is not an option at the section 366.26 hearing.  (*Ibid.*)  "A parent's struggles may be most directly relevant . . . to the ' "positive" or "negative" effect of interaction between parent and child' (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576) and then somewhat more indirectly to the harm of removing such interactions from the child's life."  (*Caden C.*, at p. 639.)

B.    *Analysis*

We apply the substantial evidence standard in reviewing the court's findings on the first two elements—whether the parent has consistently visited and maintained contact with the child and whether the relationship is such that the child would benefit from continuing it. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) And although there is little practical difference between the two standards of review, we review the court's findings as to the third element, whether there is detriment to the child in severing the relationship, for abuse of discretion. (*Id.* at pp. 639–641 ["where, as with the parental-benefit exception, 'the appellate court will be evaluating the *factual basis* for an exercise of discretion, there likely will be no practical difference in application of the two standards' " of review].)

Here, the juvenile court found that the parents regularly visited and contacted G.F. and they had an "emotionally significant relationship" with the child, which the court described as "frequent and loving" and "warm and affectionate." Substantial evidence supports the court's findings as to the first two elements of the parents' burden to establish the existence of the parental-benefit exception. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) Indeed, the Agency conceded the parents have regularly and consistently visited the child and "there might be some benefit from continuing the parental relationship." And according to its section 366.26 report, the Agency observed in particular that there is a parent-child relationship between Father and the child.

Our focus is on the third element of the exception and the juvenile court's analysis of detriment to the child in severing her relationship with the parents. Here, the record shows the court considered what are now several

37

improper factors in determining the parental-benefit exception to adoption did not apply.

First, the court adopted the Agency's arguments that "the parents have been unable to demonstrate long-term sobriety" and found that "[t]he parents just have a history of not being able to stay sober and doing what they're supposed to do in order . . . to maintain custody of this child and to maintain a positive parental relationship." Even if the evidence supported the court's finding, *Caden C.* cautions it is improper to consider a parent's struggles unless directly relevant to whether the child would benefit from continuing the relationship and be harmed, on balance, by losing it.

We first note that Mother and Father struggled with a methamphetamine addiction. *That* is the primary protective issue that brought G.F., and her older sibling T.F., into the dependency system. And it is simply uncontroverted that during the 33-month span of the case—from the filing of the dependency petition on May 11, 2018 to termination of parental rights at the section 366.26 hearing on January 29, 2021—both parents appear to have remained drug-free. Mother and Father submitted to regular urinalysis and hair follicle testing for illicit drugs, including methamphetamine, throughout the case and every test they took since May 2018 returned negative. And by the 12-month review, in addition to compliance with other provisions of their case plans, both parents had completed their substance abuse treatment programs and Father had graduated from drug court. Moreover, even the Agency's social worker testified at the contested hearing on G.F.'s section 388 petition that Mother no longer demonstrated a pattern of substance abuse. While we do not minimize the concerns regarding the July 11 incident, Father's consumption of alcohol while in substance abuse recovery, or the parents' more infrequent

38

attendance of therapy and self-help meetings "when the [COVID-19] pandemic hit," we note that the parents' progress in overcoming their methamphetamine addiction was no small feat and should not be ignored.

Further still, the court's finding that the parents "just have a history of not being able to stay sober" as it pertains to Mother and alcohol is also not supported by substantial evidence. We note that, in granting G.F.'s section 388 petition, the court specifically found that Mother had "stayed sober" during the dependency proceedings. The social worker who initially investigated the July 11 incident testified she had no reason to believe Mother consumed alcohol on the day of the event.

Even assuming there was substantial evidence to support the court's finding that the parents were unable to stay sober, the "[p]arents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the [parental-benefit] exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) In *Caden C.*, the Court of Appeal held "that because the parent continued to struggle with substance abuse and mental health issues and because of the risks of foster care and benefits of the potential adoptive home, no reasonable court could find the child's relationship with his parent outweighed the benefits of adoption." (*Id.* at pp. 625–626.) Rejecting that conclusion, the Supreme Court found "[t]he Court of Appeal did not explain how the parent's struggles related to the specific elements of the statutory exception: the importance of the child's relationship with the parent or the detriment of losing that relationship." (*Id.* at p. 626.) The juvenile court here, likewise, failed to explain how the parents' continuing struggles with substance abuse informed the court's resolution of the specific questions before it: "would the

child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Id.* at p. 638.)

Second, in considering the parents' struggles with substance abuse, the juvenile court found that it was Father's "fault" that he doesn't get to show he is a "good parent." The court stated that: "[D]ad relapsed and got involved in a scuffle with mom's new boyfriend/husband" and "[t]hat's why he's only had supervised visits" and "why he's unable to maintain that relationship and to act as a parent." However, as *Caden C.* observed, it is improper to consider a parent's struggles "as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent." (*Caden C.*, *supra*, 11 Cal.5th at p. 638; see *Cynthia D.*, *supra*, 5 Cal.4th at p. 254 ["It is not the purpose of the section 366.26 hearing to show parental inadequacy . . . [or] that the parents are 'at fault.' "], cited with approval in *Caden C.*, at p. 638.)

Lastly, in ruling this parental-benefit exception did not apply, the juvenile court also found the child's relative caregivers, not the parents, had allegedly done the "hard lifting" in caring for the child for a majority of her young life. Applying *Caden C.*, this consideration was also improper: a section 366.26 hearing "is decidedly not a contest of who would be the better custodial caregiver" for a child. (*Caden C.*, *supra*, 11 Cal.5th at p. 634 [in weighing "whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)"].)

In sum, the court in the instant case did not have the benefit of the guidance provided in *Caden C.* and as a consequence, considered several improper factors in determining that the parental-benefit exception did not

apply.[8]  We therefore remand the matter for the court to conduct, if necessary, a new section 366.26 hearing in accordance with the principles articulated in *Caden C.* and this decision.

## DISPOSITION

The juvenile court's orders summarily denying Father's section 388 petition and terminating parental rights are reversed.  The matter is remanded for the court (1) to conduct a full hearing on Father's section 388 petition seeking a change in the child's placement; and, depending on the outcome of that hearing, (2) to reconsider in light of *Caden C.* whether the parental-benefit exception to adoption applies in this case.  In making these determinations, the court may consider the family's current circumstances and any developments in the dependency proceedings that may have arisen during the pendency of this appeal.  Should they deem it desirable, the

---

[8]     We note the Agency, in recommending the court terminate parental rights, also relied on various factors that were specifically disapproved by *Caden C.*, including that the parents allegedly had failed to remain sober during G.F.'s dependency, and that the relative caregivers and not the parents were the better custodial caregiver for the child.

parties may stipulate to immediate finality and issuance of the remittitur. (See rules 8.272(c)(1), 8.490(d).)

DO, J.

WE CONCUR:


HALLER, Acting P. J.


GUERRERO, J.